FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA  2020 FEB 11  PM 2:57
ORLANDO DIVISION

US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

| | |
|---|---|
| KARA ADAMS, in the case of THE WOMEN OF COLEMAN CAMP, et al., <br><br> Plaintiffs <br><br> WILLIAM BARR, Attorney General, United States Department of Justice; KATHLEEN HAWK SAWYER, Director, Federal Bureau of Prisons; J.A. KELLER, Regional Director, Southeast Region, Federal Bureau of Prisons; ROY CHEATHAM, SES Complex Warden, Federal Bureau of Prisons; KATHY LANE, Warden, FCC Coleman, Federal Bureau of Prisons; RIVERA, Camp Administrator, FCC Coleman; <br><br> Defendants | Civil Action No. 6:20-cv-230-ORL-31EJK <br><br> CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES |

## INTRODUCTION

### I.   JURISDICTION AND VENUE

1. This is a civil action authorized by *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), to redress the deprivation, under the color of law, of rights secured by the Constitution of the United States by class action under Rule 23 of the Federal Rules of Civil Procedure. The court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 1391. The plaintiffs seek declaratory relief pursuant to 28 U.S.C. §§ 2241, 2284, 3582(c)(1(A)(i) for Compassionate Release; remedy of prison conditions pursuant to 28 U.S.C. § 3626(a); and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure. There is no alternative capable to protect the Constitutional interests of the women at stake and the deprivation was committed by federal actors. *Minneci v. Pollard*, 565 U.S. 118 (2012).

8. Defendant, Camp Administrator Rivera, is the current Camp Administrator at the Coleman Camp who, at all times mentioned in this complaint was assigned for the welfare of all the female inmates in the Camp prison.

IV. FACTS

9. Adams and other inmates were transferred to Coleman Camp on November 14, 2018. Prior to the transfer, while at the Marianna Camp, the officials there decided not to evacuate the inmates for the approaching hurricane. On October 10, 2018, a Category 5 hurricane, Michael, destroyed the prison while the inmates were held in the lower parts of the living quarters. The following day the inmates were evacuated to the federal correctional institution ("FCI") in Tallahassee, Florida. The building in which the women were held was under construction and had sewage backed up into the shower area. The inmates were held there for approximately five weeks until they were transferred to their new institutions.

10. On November 14, 2018, Adams was transferred to Coleman Camp and was placed in one of the lower housing units, called F1. Adams was placed in room 117 across the wall from the bathroom area. The ceiling in the F1 bathroom had been removed and still has not been replaced. The metal frames that held the ceiling in place were left and are in a serious state of corrosion. The air conditioning ducts and the plumbing pipes were left exposed. The water condensation accumulates on the frames, air ducts, and the pipes, creating drips. The inmates take showers while the droplets from the toxic liquid from the ceiling falls on them. Adams has made a complaint via the staff email messaging system in regard to the water dripping on her body while showering. Adams has received no response from the staff on the issue.

11. As early as January of 2019, Adams has experienced signs and symptoms of the legionella infection. In December of 2019, Adams had a small fever, headaches, and cough, coupled with a shortness of breath. A few weeks later in January of 2020, the symptoms returned

2. The Middle District of Florida is an appropriate venue under 28 U.S.C. § 1391(b)(2) because it is where the events giving rise to the claims occurred

## II. PLAINTIFFS

3. The Plaintiffs, Kara Adams, in the case of "The Women of Coleman Camp", et al., are and were at all times mentioned herein prisoners of the Department of Justice in the state of Florida in the custody of the Federal Bureau of Prisons. The prisoners are currently confined in the Federal Correctional Complex - CAMP, in Coleman, Florida.

## III. DEFENDANTS

4. Defendants, William Barr, as the Attorney General of the United States Department of Justice, and Kathleen Hawk Sawyer, as the Director of the Federal Bureau of Prisons, are legally responsible for the overall operation of the Departments and each of the institutions and the individual sentences under its jurisdiction, including the Federal Correctional Complex Camp in Coleman, Florida and the Women of Coleman Camp.

5. Defendant, Regional Director J.A Keller, is the current Southeastern Regional Director in Atlanta, Georgia and is legally responsible for the overall operation of the region and each institution under the jurisdiction, including the Federal Correctional Complex Camp in Coleman, Florida.

6. Defendant, Complex Warden Roy Cheatham, is the current Warden for the SES Complex and Camp. He is legally responsible for the operations of the Coleman Prison Camp and for the welfare of all the inmates in that Complex.

7. Defendant, Warden Kathy Lane, is the current Warden of the Coleman Camp operating under the FCI Low. She is legally responsible for the operation of the Coleman Prison Camp and for the welfare of all the inmates in that prison.

again but were not intense. After hearing the rumors of the legionella infections, Adams reported to sick call on January 23, 2020, in fear because of her chronic asthma. Adams was not seen that day, so she reported to sick call the following day on the 24th. On the 24th, she was seen by a doctor. Adams told the doctor about her symptoms and was examined with her lungs being reported as clear. Next a Chest X-ray was obtained, followed by blood and urine testing. No one informed Adams that she was being tested for legionella bacteria, but she saw it on her paperwork.

12. Later on January 24, 2020, at around 6:00 pm, Adams was called to medical to pick up five days of Levofloxacin, an antibiotic.

13. On January 28, 2020, at mainline, where inmates address their concerns to the Administration, there was a line to speak with Camp Administrator Rivera. Several inmates were asking him about the legionella rumors and worried about the quality of the water. Adams observed C.A. Rivera become irate and tell the inmates that the water was fine to drink, that there was no legionella outbreak, and that an inmate in F1 was lying about getting bottled water to drink (because of concerns about the water quality). Later that same day, Warden Lane issued a Memorandum to the FCC Coleman Inmates, "SUBJECT: Legionella," stating that some inmates have been diagnosed with legionella pneumonia and that the Sumter County and Florida Health Departments were working together to investigate the source of the matter. Adams has not been informed of the source of the "dangerous bacteria."

14. On January 31, 2020, Adams was placed on the call hour for another X-ray at 9:00 am. At that appointment, she informed staff that she had just had an X-ray. The staff member replied that Adams tested positive and another X-ray was required. The doctor still has not informed her of the test results.

    A. *Conditions of the Housing Units*

15. Each of the units is in a state of disrepair. There are four units in the Coleman Camp. There are sick inmates in each of these units.

B. *The Water Source*

16. All of the bathroom ceilings are either completely cut out or missing ceiling tiles. The pipes and air ducts are exposed, collecting condensation and dripping on the women. The leaking water is destroying what is left of the remaining ceiling tiles. The drains in both the showers and the sinks periodically back up with sewage waste. When the basins are contaminated, they are covered with garbage liners until fixed, often remaining like that for months at a time. Often the mop closet for F1 and F3 back up and flood the front lobby of F1, and the same for the sister units F2 and F4. This has often provided a breeding area where sewer flies swarm the inmates when entering the room. The toilets in all the units are usually out of order, leaking from the base of the toilet, spraying the walls when flushed or just continuing to run. The showers appear to be covered in black mold and are periodically painted over.

17. The water main pipes have been breaking periodically. There are days when the inmates are without water and when the water is turned back on, it is full of soil. Recently, the main lines have been disconnected twice. The water heaters have gone out several times in the last year and this last time it was down for over a week. Inmates, when allowed, had to go upstairs to take a warm shower. The inmates in wheelchairs did not have the ability to go upstairs.

18. Since about October of 2019, when the quarter changed, the budget was cut and the inmates no longer had weekend orderlies. The bathrooms did not always have adequate supplies of soap and paper towels. Does the disinfectant used within the prison kill legionella? If it is, is it being properly diluted?

C. *The Air Source*

19. The air conditioning ducts have visible particles coming out of some of the vents. The vents are also leaking water onto some inmate beds; some vents are covered with liners and shirts to stop the leaks. Inmates cannot identify a time in the last few years that the air ducts in the units were cleaned.

    D. *Medical Call Out*

20. The month of January 2020, hundreds of inmates were lining up at the medical sick calls. On January 24, 2020, around 100 women were lined up and around 60 were tested on that day by Chest X-ray, blood, and urine. Over 10 women were sent to the hospital around that day alone. Six of the inmates have not returned. Many more inmates need examinations and treatment but have not been tested or seen by medical staff.

V.    EXHAUSTION OF LEGAL REMEDIES

21. Plaintiffs have used the prisoner grievance procedures available at the Coleman Camp and pursuant to the Compassionate release by the amended procedures of the Prison Litigation Reform Act ("PLRA") in the First Step Act. There are some circumstances that require emergency action and the prisoners cannot wait on the Warden's response to finish the grievance process. The women at the Coleman Camp have been exposed, for an unknown period of time, to the legionella bacteria. Studies and experts in their investigations of legionella have not determined what the long-term effects of the dangerous bacteria is after a prolonged exposure. Legionnaire's Disease has a 10% death rate and even if the inmates are administered the proper doses of medication, they are still in the same poisonous environment. This "irreparable injury" cannot be fixed by money, repairs of the prison, or transfers to other institutions.

VI.    LEGAL CLAIMS

22. To challenge the prison conditions using the Eighth Amendment, the prisoners must meet both "objective" and "subjective" requirements. *Farmer v. Brennan*, 511 U.S. 825 (1994);

*Wilson v Seiter*, 501 U.S. 294 (1991). The evidence must show conditions are serious and extreme.

### A. *Objective and Subjective*

23.   Plaintiffs reallege and incorporate by reference paragraphs 1-21.

### B. *Basic Rights*

24.   The basic rights of prisoners are the right to humane conditions and the right to adequate medical care while serving a sentence. It is the rule of law that a prison or its officials violate the Eighth Amendment when acting with "deliberate indifference" to prison conditions that expose the prisoners to an unreasonable risk of serious harm or deprive a prisoner of a basic human need.

### C. *Negligence*

25.   The prison is negligent when its officials "fail to use reasonable care." Since people have different ideas about what is reasonable especially in a prison, the court must ask what a "reasonable prudent person would do in a similar situation."

26.   While the prison does not have a duty to provide a "risk-free" environment, they do have a duty to keep the prisoners safe and protected from unreasonable risk. The Coleman Camp officials have failed in their duties to keep the water and air sources in the prison properly maintained, and when inmates became ill, the medical services failed to respond adequately with medical care. *See Plummer v. United States*, 580 F.2d 72 (3rd Cir. 1978) (where the prisoners successfully made a negligence claim based on exposure to tuberculosis); *Talal v. White*, 403 F.3d 423 (6th Cir. 2005) (where the prisoners were exposed to secondhand smoke); and *LaBounty v. Coughlin*, 137 F.3d 68 (2nd Cir. 1998) (where the inmates were exposed to asbestos).

27.   When the prison learned of the presence of the legionella bacteria in their prison on or about January 22, 2020, a memo was emailed to staff. Instead of testing, informing or educating

the inmates, an inmate observed and read the staff memo and told inmates who told inmates about the diagnosis of inmates with Legionnaire's Disease. Panic ensued throughout the prison Camp.

28.  On January 28, 2020, several of the inmates sought out Camp Administrator Rivera at mainline about not getting bottles of clean water to drink because the rumors were that we had contaminated water with the legionella bacteria. The Camp Administrator appeared to become agitated. He called a woman in F1 a liar and denied both the legionella bacteria and that the water was contaminated. Later that same day, Warden Lane released a memorandum confirming the legionella outbreak. See Exhibit A

   D. *The Legionella Bacteria*

29.  According to the memo, Wikipedia, and case law experts, the legionella bacteria is found in fresh water and water droplets. It is usually spread by breathing in mist that contains the bacteria or can occur when contaminated water is aspirated. Typically, it does not spread from person to person, but that may be debatable among those who are in close institutionalized conditions. The length of time between the exposure to the bacteria and the symptoms is generally 2 to 10 days, but can extend to 20. Prevention depends on good maintenance of water systems. The treatment is with antibiotics (recommended agents include fluoroquinolones, azithromycin, or doxycycline). Hospitalization is often required. About 10% of those who become infected die. Prolonged exposure to the toxic bacteria may cause serious harm to a person's health in the future and the experts do not seem to know the long-term ramifications of the legionella bacteria. The experts who investigate this serious bacteria say that it is resistant and that the bacteria affects people differently. *See In re Flint Water Cases*, Lexis 195714 (2019); *Mueller v. Chugach Fed. Solutions, Inc.*, Lexis 86283 (11th Cir. 2014). The court in *Sofillas v. Carnival Corp.* recognized that the seriousness of just saying the name Legionnaire's

Disease could prejudice a company's business and reputation by its association and allowed the term "dangerous bacteria" to be used instead. The expert in the case expressed his belief that "the presence of Legionella in biofilm increases the likelihood of dangerous bacteria, like MRSA, existing in the biofilm." *Sofillas v. Carnival Corp.*, Lexis 139431 (11th Cir. 2016).

30. The signs and symptoms of the legionella bacteria vary from cough, headaches, fever, muscle aches, nausea, vomiting, diarrhea, rashes, neurological symptoms, chest pain, gastrointestinal symptoms, and pneumonia. The women have been exhibiting most of these signs since their arrival at the Coleman Camp, but the symptoms have become more intense since October of 2019.

### E. *The Prison's Remedies for A Violation for Prison Conditions*

31. The Prison Litigation Reform Act ("PLRA") made it more difficult for prisoners to gain relief in the Federal Courts without starting and/or completing their administrative remedy process within the prison.

32. However, there are emergency situations that require relief before the PLRA process has been completed. Such as in this case, where the environment is harmful to the prisoners and the transfer of the prisoner to another institution could have additional environmental harms that cause further injury or, because of the institutionalized closeness, could contaminate the other inmates with the bacteria.

33. The First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i), allows for the Compassionate Release of an inmate for "extraordinary and compelling reasons." The inmates are allowed to file a grievance requesting the Warden consider the release for the correction of the violation of the prison's conditions which have exposed the women to the legionella bacteria. Those filings are attached to the declarations of the women at the Coleman Camp. See Exhibit B.

34. Since the memo by Warden Lane was released on January 28, 2020, the inmates are housed in the same contaminated environment. The Warden knows the environment is deadly. At this point, the inmates consider this a deliberate indifference and an intentional poisoning. This is an "irreparable harm" and unreasonable risk to the safety and protection to the women of Coleman Camp, and it is for this reason we are seeking release. See *Carthen v. Snyder*, 329 F. Supp. 3d 369 (E.D. Mich. 2018).

35. 18 U.S.C. § 3626 it gives instructions to the court about the appropriate remedies with respect to prison conditions. The prospective relief in any civil action for prison conditions shall extend no further than necessary to correct the violation of the Federal right of the plaintiffs. Meaning, that the court needs to assess the least intrusive means necessary to correct the violation of the Federal Right. By request of the plaintiffs, when the prison officials can provide no remedy to correct the Constitutional right of the prolonged exposure to each woman's body to the poisonous legionella bacteria, the plaintiffs seek for a signed release order asking for the three judge court as required under § 3626(a)(3)(c).

F. *Overcrowding*

36. The overcrowding of the prisons are directly manifested by the budget of each prison. Just because a prison can be able to accommodate 400 inmates and the budget provides the essentials for only 300 inmates, then that budget is strained adding just one more inmate. It is the budget that calls the marker for overcrowding. A prison demonstrates the effects of overcrowding when it makes critical decisions about the prison's conditions and the inmates' safety, medical care, and protection of an inadequate budget. Usually when prison officials claim that they do not have the budget to fix a problem and/or skim on a prisoner's essentials, the court does not generally accept this kind of defense (the Supreme Court has not clearly addressed this matter). See *Carty v. Turnball*, 144 F. Supp. 2d 395 (D.V.I. 2001). In *Brown v. Plata*, 563 U.S. 493 (2011), 46,000

inmates were released from custody because the prison could not constitutionally house the inmates in California, around 10,000 were of highest risk.

37. The Plaintiffs reallege and incorporate by reference to paragraphs 1-35.

38. The officials at the Coleman Camp in Florida have and are continuing to violate our Eighth Amendment right to humane conditions and the right to adequate medical care by the prolonged exposure of the legionella bacteria, and serious and extremely dangerous bacteria. Because this exposure is "irreparable" and the future harms or continuous injuries remain unknown, the prison is in violation of the Eight Amendment by subjecting the inmates to cruel and unusual punishment.

39. The plaintiffs have no plain, adequate or complete remedy at law to redress the wrongs described herein. The Plaintiffs have been and will continue to be irreparably injured by the conduct of the defendants unless this court grants the declaratory and injunctive relief which the plaintiffs seek.

VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this court enter judgment granting the plaintiffs:

A. A declaration that the acts and omissions described herein violated plaintiffs' rights under the Constitution and laws of the United States.

B. A temporary, preliminary, and permanent injunction ordering the defendants of the Bureau of Prison's Coleman Camp to sign a prison release order or Compassionate release with medical coverage and nominal damages they seek release.

C. Compensatory damages be the issuance of Federal Blue Cross and Blue Shield insurance or its successor be issued to each inmate for life to cover medical expense, with no co-pay.

D. Punitive damages are to punish the members of the prison who violated the women's rights and to set an example to discourage other prison staff from water and air quality maintenance in the future. There is a pattern of this neglect and without punitive damages there is a threat of more neglect in the future. We leave the punitive damages for the court or the jury to decide what is deemed necessary.

Respectfully submitted this ____ day of February 2020.

s/ Kara Adams
**See separate page**
_____
KARA ADAMS 61718-019
*Pro Se*

## LIST OF EXHIBITS AND DECLARATIONS

EXHIBIT A:   Memorandum SUBJECT: Legionella by Warden Lane, 1 page back and front

EXHIBIT B:   Declaration for KARA ADAMS and copy of BP 9, 4 pages

Declaration for D. Anda Norbergs and PLRA proof, 7 pages

Declaration for Toni Corker and PLRA proof, 2 pages

Declaration for Jenifer Hoffman and PLRA proof, 3 pages

Declaration for Crystal Tunning and PLRA proof, 2 pages

Declaration for Donna Demps and PLRA proof, 2 pages

Declaration for Delexsia Harris and PLRA proof, 4 pages

Declaration for Christel Ivester and PLRA proof, 2 pages

Declaration for Karen Colie and PLRA proof, 6 pages

Declaration for Kerri Torres and PLRA proof, 2 pages

Declaration for Anastassia Bogomolova and PLRA proof, 15 pages

Declaration for Lousie Smith and PLRA proof, 4 pages

Declaration for Toni Platt and PLRA proof, 2 pages

EXHIBIT C:   Articles relied on for legionella facts, 10 pages

**EXHIBIT A**



U.S. Department of Justice
Federal Bureau of Prisons
Federal Correctional Complex-LOW
P.O. Box 1021
Coleman, Florida  33521-1021

January 28, 2020

MEMORANDUM FOR FCC COLEMAN INMATES

FROM:     Kathy P. Lane, Warden

SUBJECT:  Legionella

Recently, some inmates at FCC Coleman-Satellite Camp were diagnosed with legionella pneumonia.  Legionella pneumonia is a type of lung infection which is caused by breathing in droplets of water containing the legionella bacteria.  It is not generally transmitted person-to-person.

FCC Coleman and the Sumter County Florida Health Department are working together to investigate the source of this matter.  In conducting this investigation, the health and safety of staff, inmates, and the public are the BOP's highest priority.  To that end, we will be consulting with the Sumter County Florida Health Department and carefully reviewing any recommendations.

Please see the attached CDC fact sheet regarding legionella infection.  We will keep each of you updated as we receive any additional information.

HOFFMAN, JENIFER 6133001

EXHIBIT B

*and*

EXHIBIT C

Plaintiff Kara Adams asks the court contact the appropriate individual at Federal Correctional Complex – Low, Coleman, Florida to request Exhibits B and C be sent to the court.

Plaintiff Kara Adams is in possession of the Exhibits.

Via text message Plaintiff Kara Adams states: *Tell the court that I cannot get the mail out. They have me red flagged. The court can call here and request to have them sent to him. I am scared to mail them without some help from the court. Some of the information is sensitive and we need protection.*